### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| DAVID ABRAMS, *not individually but*    ) <br> *solely as the Liquidating Trustee and*    ) <br> *court-appointed manager of Heartland*   ) <br> *Memorial Hospital, LLC,* and          ) <br> HEARTLAND MEMORIAL HOSPITAL,   ) <br> LLC, the Debtor, an Indiana limited    ) <br> liability company,                ) <br>                            ) <br>         Plaintiffs,             ) <br>                            ) <br>        v.                     ) <br>                            ) <br> DLA PIPER (US) LLP, *a Maryland*    ) <br> *limited liability partnership*,         ) <br>                            ) <br>         Defendant.          ) | CAUSE NO.: 2:12-CV-19-TLS |

### OPINION AND ORDER

This matter is before the Court on a Motion to Dismiss Counts V and VI of Second

Amended Complaint [ECF No. 17-2 at 54–56], originally filed on July 20, 2012, by the

Defendant, DLA Piper (US) LLP, as ECF No. 73 in Adversary Proceeding No. 09-02049-jpk.

On August 28, 2012, this Court granted the Defendant's Renewed Motion to Withdraw

Reference [ECF No. 7] because claims for legal malpractice and breach of fiduciary duty were

pending before the bankruptcy court. Presently all six counts of the Second Amended Complaint

[ECF No. 17-2 at 2–36] are before this Court. But because the Court finds that Counts V and VI

of the Second Amended Complaint do not state claims upon which relief can be granted, the

Court will dismiss those counts without prejudice, with leave to re-file.

### PROCEDURAL BACKGROUND

In January 2007, creditors filed an involuntary Chapter 7 bankruptcy petition against the

Debtor, Plaintiff Heartland Memorial Hospital, LLC. On March 2, 2007, the bankruptcy court granted relief against the Debtor and converted the case to Chapter 11. On November 19, 2008, the bankruptcy court confirmed the Debtor's liquidating plan of reorganization and appointed Plaintiff David Abrams as liquidating trustee. On February 26, 2009, Plaintiff Abrams filed a Complaint against the Defendant in bankruptcy court, Adversary Proceeding No. 09-02049-jpk, seeking to avoid $100,000 in allegedly preferential transfers and to disallow the Defendant's claim in the bankruptcy. On March 2, 2009, the Plaintiff filed an Amended Complaint against the Defendant in Adversary Proceeding No. 09-02049-jpk, alleging four counts involving fraudulent and preferential transfers.

On March 3, 2009, the Plaintiff filed a Complaint against the Defendant in Case No. 09L002543 in the Circuit Court of Cook County, Illinois, alleging legal malpractice and breach of fiduciary duty. On October 5, 2011, the Cook County judge dismissed that Complaint with prejudice, finding that the liquidating plan required the Plaintiff to pursue legal malpractice claims in the bankruptcy court. The Plaintiff filed a notice of appeal of the Cook County dismissal order on October 14, 2011.

On October 5, 2011, the Plaintiff filed his Amended Motion for Leave to File Second Amended Complaint against the Defendant in Adversary Proceeding No. 09-02049-jpk, seeking to add the claims for legal malpractice and breach of fiduciary duty to the other claims already before the bankruptcy court, seeking to add a new party plaintiff to those counts, and seeking a determination that the amendments to the complaint would relate back to February 26, 2009—the date of the filing of the original Complaint in Adversary Proceeding No. 09-02049-jpk.

On November 7, 2011, the Defendant filed its first Motion to Withdraw Reference [ECF

No. 1], asking this Court to withdraw the reference from the bankruptcy court and to decide the pending Amended Motion for Leave to File Second Amended Complaint. The Court denied the Defendant's request in an Opinion and Order dated May 15, 2012 [ECF No. 6], finding that withdrawal of the reference was premature because claims for legal malpractice and breach of fiduciary duty were not yet before the bankruptcy court. After the Court issued its May 15 Opinion and Order, the bankruptcy court granted the Plaintiff's Amended Motion for Leave to File Second Amended Complaint. Therefore, in an Opinion and Order dated August 28, 2012 [ECF No. 8], this Court granted the Defendant's Renewed Motion to Withdraw Reference.

On July 20, the Defendant filed a Motion to Dismiss Counts V and VI of Second Amended Complaint [ECF No. 17-2 at 54–56] along with a Memorandum of Law in Support [ECF No. 17-2 at 57–76]. The Plaintiffs filed a Response [ECF No. 13] on September 25, and the Defendant filed a Reply [ECF No. 16] on October 15.

The Defendant's Motion to Dismiss Counts V and VI of Second Amended Complaint is now fully briefed and ripe for this Court's ruling.

**FACTUAL BACKGROUND**

The Court draws the following facts from the Second Amended Complaint. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009) (stating that "for purposes of the motion to dismiss we accept all factual allegations in the complaint and draw all reasonable inferences from those facts" in favor of the plaintiffs).

The Debtor is an Indiana limited liability company, formerly operating as a surgery center and hospital located in Munster, Indiana. (2d Am. Compl. ¶ 2, ECF No. 17-2 at 3.) The

3

Debtor was originally organized on or about February 16, 1999, under the name Illiana Surgery Center, L.L.C. Beginning in 1999, the Debtor operated a number of for profit, physician-owned healthcare practices in Indiana and Illinois. On or about May 18, 2006, the Debtor renamed itself Heartland Memorial Hospital, LLC. The Defendant law firm is a Maryland limited liability partnership with offices in Chicago, Illinois, and around the world.

On or about June 6, 2002, iHealthcare, Inc., was formed and became the sole equity owner of the Debtor. From 2002 until 2004, the Debtor undertook the construction of a 55-bed ambulatory care facility in Munster, Indiana. The Debtor was unable to complete construction of the facility, however, and thereafter "at all relevant times . . . [the Debtor] was insolvent." (2d Am. Compl. ¶ 18.) The Plaintiffs allege that from 2004 until October 2005, a management committee for the Debtor—styled as the "Old Management"—managed the business affairs of the Debtor. After October 2005, a group styled as the "New Management" managed the affairs of the Debtor. The New Management included Leroy Wright and Alfred Sharp.

The Munster Medical Holdings, LLC, Sale/Leaseback

On March 16, 2004, Thomas McDermott, Sr., loaned the Debtor approximately $2.5 million. McDermott held a fifty percent equity interest in Munster Medical Holdings, LLC. On or about August 30, 2004, the Debtor sold the Munster hospital facility to Munster Medical Holdings for $30 million, and agreed to lease the facility back for $298,723 per month for the first five years. The Debtor gained a 25 percent interest in Munster Medical Holdings as part of the transaction, which closed on or about December 22, 2004. The Debtor also had an option to repurchase the real estate on certain terms and conditions. In December 2005, the Debtor gained an additional 27.5 percent interest in Munster Medical Holdings. The Plaintiffs allege that the

result of the Munster Medical Holdings Sale/Leaseback transaction was "to render [the Debtor] insolvent." (2d Am. Compl. ¶ 98.) From April to October 2005, the Debtor failed to pay approximately $900,000 in employee withholding taxes to the Internal Revenue Service and the Indiana Department of Revenue. It is undisputed that the Defendant was not in any way involved in the Munster Medical Holdings, LLC, Sale/Leaseback transaction.

        The AIC Sale/Leaseback

        In October 2005, Wright Capital Partners was an entity owned and controlled by Leroy Wright. At that time, Wright Capital Partners loaned the Debtor $2.5 million in exchange for Wright and his associates Alfred Sharp and Allen Hill being placed in control of the Debtor. The Old Management agreed to this arrangement. Further, the shareholders of iHealthcare agreed to sell their shares in iHealthcare to Wright Capital Partners for $25 million. Because Wright Capital Partners did not have the necessary cash, however, the parties amended the purchase agreement on March 24, 2006. Pursuant to the amended agreement, Wright Capital Partners purchased the shares of iHealthcare through a "leveraged finance transaction or leveraged buy-out transaction" (*id.* ¶ 29 (quotation marks omitted)) in which the Debtor sold substantial portions of its ancillary real estate to an entity called AIC Holding V, LLP, for $18 or $19 million,[1] and then leased back those properties for $163,000 per month. Wright Capital Partners used some of the proceeds generated from the Debtor's sale/leaseback to purchase the shares of iHealthcare from the iHealthcare shareholders, including the Old Management. The Plaintiffs maintain that "[i]n effect, Wright Capital Partners purchased [the Debtor] with the proceeds from

---

[1]Paragraph 88 of the Second Amended Complaint indicates that the Debtor sold the real estate for $19 million, but Paragraph 115 indicates that the Debtor sold the real estate for $18 million.

the sale of [the Debtor's] own assets." (*Id.* ¶ 30.)

Wright Capital Partners, Wright, Sharp, and/or Hill formed an entity called Wright Health Systems, Inc., on or about September 28, 2005, and changed the name of said entity to Heartland Memorial Holdings, Inc., on or about September 12, 2006.

The Defendant served as legal counsel to Heartland Memorial Holdings and Wright Capital Partners in conjunction with the AIC Sale/Leaseback transaction, and was paid approximately $382,000 from the sale proceeds, "despite the fact that the merger agreement required the parties to bear their own legal expenses." (2d Am. Compl. ¶ 34.) Further, the AIC Sale/Leaseback "resulted in the transfer of approximately $7.3 million of [the Debtor's] assets to the equity owners of iHealthcare." (*Id.* ¶ 35.)

The Plaintiffs allege that "[t]he Old Management knew and should have known that the AIC/Leaseback transaction was entered into by [the Debtor] not for the benefit of [the Debtor] and its creditors, but for the specific benefit of the Old Management, the owners of iHealthcare. This transaction enriched the Old Management at the direct expense of [the Debtor] and its creditors." (*Id.* ¶ 118.)

The Redemption Transaction

After the AIC Sale/Leaseback transaction, the New Management managed the affairs of the Debtor, and the financial condition of the Debtor continued to deteriorate. The Debtor continued to fail to pay employee withholding taxes. Shortly after the AIC Sale/Leaseback, the Debtor owed $4 million to the Internal Revenue Service, and $500,000 to the Indiana Department of Revenue. Nevertheless, the New Management authorized payment of $382,000 to the Defendant for its representation of Wright Capital Partners in the AIC Sale/Leaseback

6

transaction.

Within four months of the AIC Sale/Leaseback, the Defendant stated that the financial position of the Debtor was "perilous." In a Memorandum addressed to Leroy Wright and dated August 7, 2006, the Defendant stated that it had "evolved and proposed a transaction structure, which, in [the Defendant's] judgment, provided Wright Capital with a phenomenal upside and, while exceedingly generous to Wright, permitted [the Debtor] with the greatest opportunity for survivability." (Mem., ECF No. 17-2 at 34.) The Defendant also threatened to send its outstanding invoices to collections unless the Debtor either agreed to go forward with the redemption transaction or proposed an alternative. Accordingly, the Debtor executed the Defendant's proposed redemption transaction, paying $300,000 to Wright Capital Partners in order to allow Heartland Memorial Holdings, Inc., to redeem the equity interests of Wright Capital Partners, Wright, and/or Sharp in Heartland Memorial Holdings, Inc. Another result of the redemption transaction was removal of Wright from his ownership of the Debtor. Further, as part of the transaction, the Second Amended Complaint alleges that the Debtor agreed to assume and be responsible for payment of over $883,000 in the Defendant's invoices reflecting work performed for and on behalf of Wright Capital. The Second Amended Complaint additionally alleges that "[o]n information and belief, [the Debtor] paid [the Defendant's] outstanding invoices for over $883,000 in or around September/October of 2006." (2d Am. Compl. ¶ 38.) However, according to documentation submitted along with the Second Amended Complaint, it is Heartland Memorial Holding Company, Inc., and not the Debtor which became obligated to pay $883,000 to the Defendant on or about September 1, 2006. (*See* Letter, ECF No. 17-2 at 36.)

After the redemption transaction, the Debtor's financial condition continued to

deteriorate.

The SSFHS Sale/Leaseback

On October 31, 2006, the Debtor sold the Munster hospital facility and most of its operating equipment to the Sisters of St. Francis Health Services (SSFHS) for $42.8 million, and leased the property back from SSFHS for approximately $500,000 per month. Because the Debtor had previously sold the Munster facility to Munster Medical Holdings, LLC, it had to first exercise its right to buy the facility back from Munster Medical Holdings, LLC, before it could sell the facility to SSFHS. The Second Amended Complaint alleges that "[the Debtor] received a disproportionately small portion of the proceeds from the SSFHS Sale/Leaseback transaction due to the decision regarding the allocation of the purchase price between [the Debtor] and insiders holding an interest in the facility through Munster Medical Holdings LLC." (2d Am. Compl. ¶ 45.) The New Management authorized transfer of a portion of its interest in Munster Medical Holdings to a member of the New Management, resulting in significant financial gain to that member pursuant to the SSFHS Sale/Leaseback. Finally, although the Defendant "knew or should have known that [the Debtor's] financial condition remained perilous and that there were even more serious questions about its survivability and the financial viability of [the Debtor] as an operating entity" (*id.* ¶ 45), the Plaintiffs allege that "on information and belief, [the Defendant] received payments at or around the SSFHS closing, and an additional $100,000 on January 3, 2007" (*id.*).

In Count V of the Second Amended Complaint, for legal malpractice, the Plaintiffs allege that the Defendant represented the Debtor beginning with the AIC Sale/Leaseback transaction, and breached its duty to the Debtor by: 1) providing "substantial legal assistance" in the AIC

8

Sale/Leaseback transaction when it knew or should have known that the Debtor's financial viability was in doubt; 2) evolving and proposing the redemption transaction when it knew the perilous financial condition of the Debtor; and 3) providing "substantial legal assistance" in the SSFHS Sale/Leaseback transaction when it knew or should have known that the Debtor's financial condition remained perilous. (2d Am. Compl. ¶ 145.) Further, the Plaintiffs allege that "[h]ad Heartland been properly and competently advised by [the Defendant], it would not have engaged in the transactions described in the preceding paragraphs, or it would have engaged in them only on terms that were in its interest." (*Id.* ¶ 146.)

In Count VI of the Second Amended Complaint, for breach of fiduciary duty, the Plaintiffs allege that the Defendant owed fiduciary duties to the Debtor, "including the duty of loyalty and the duty not to put its own interests or the interests of its other clients above those of [the Debtor]." (*Id.* ¶ 149.) The Plaintiffs allege that the Defendant breached those duties by: 1) "plac[ing] the interest of other clients, particularly Wright Capital Partners and its related persons and entities above those of [the Debtor]"; and 2) "maneuver[ing] to have [the Debtor] pay it for work that the firm performed for other clients." (*Id.* ¶ 150.)

## STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). The court presumes all well-pleaded allegations to be true, views them in the light most favorable to the plaintiff, and accepts as true all reasonable inferences to be drawn from the allegations. *Whirlpool Fin. Corp.*, 67 F.3d 605, 608 (7th Cir. 1995).

The Supreme Court has articulated the following standard regarding factual allegations that are required to survive dismissal:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks, ellipsis, citations, and footnote omitted). A complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Although the court must accept as true all well-pleaded facts and draw all permissible inferences in the Plaintiff's favor, it need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012) (stating that a court need not accept as true "legal conclusions or conclusionary allegations that merely recite a claim's elements"). Legal conclusions can provide a complaint's framework, but unless well-pleaded factual allegations move the claims from conceivable to plausible, they are insufficient to state a claim. *Iqbal*, 556 U.S. at 680; *see also Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011). A plaintiff can also plead himself out of court if he pleads facts that preclude relief. *See Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007); *McCready*

*v. Ebay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006). Finally, determining whether a complaint states a plausible claim for relief requires a reviewing court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## ANALYSIS

The Defendant's Motion to Dismiss concerns only Counts V and VI of the Second Amended Complaint. The Court will analyze these Counts in turn. Because it appears that neither Count V nor Count VI states a claim upon which relief can be granted, the Court will grant the Motion to Dismiss.

### A.    The Plaintiffs' Count V Claim for Legal Malpractice Fails to State a Claim Upon Which Relief Can Be Granted

The Defendant argues in its Motion that Count V should be dismissed because it fails to state a claim upon which relief can be granted under Rule 12(b)(6). Specifically, the Defendant argues that the Plaintiffs' Count V claim for legal malpractice is wanting because rather than alleging that the Defendant rendered deficient legal services, it attempts to hold the Defendant responsible for the Debtor's poor business decisions. Lawyers do not owe a legal duty to protect clients from making poor business decisions, the Defendant argues, and therefore the Plaintiffs' claim for legal malpractice must be dismissed under Rule 12(b)(6). The Plaintiffs respond that they have alleged more than a failure to give business advice. The Plaintiffs insist that their allegations that the Defendant provided legal services structuring transactions designed to bankrupt the Debtor to the benefit of insider shareholders, while the Defendant knew or should

11

have known that the Debtor's financial condition was perilous, state a claim for legal malpractice. The Defendant replies that the Plaintiffs are attempting to recharacterize their allegations into a conspiracy to loot the Debtor or an actual fraud on the Debtor, but that the Plaintiffs' allegations in the Second Amended Complaint do not state such claims. Instead, the Defendant argues, the Plaintiffs have attempted to allege legal malpractice in connection with the provision of legal services but have not alleged that the Defendant breached a duty of care in the provision of its legal services.

"To establish legal malpractice, a plaintiff must prove the existence of an attorney-client relationship; a duty arising from that relationship; a breach of that duty; a proximate causal relationship between the breach of duty and the damages sustained; and actual damages." *Glass v. Pitler*, 657 N.E.2d 1075, 1078 (Ill. App. Ct. 1995) (citing *Metrick v. Chatz*, 639 N.E.2d 198 (Ill. App. Ct. 1994) and *Skorek v. Przybylo*, 628 N.E.2d 738 (Ill. App. Ct. 1993)). *See also In re Estate of Lee*, 954 N.E.2d 1042, 1046 (Ind. Ct. App. 2011) (setting out the elements for a claim of legal malpractice).[2]

The Court agrees with the Defendant that the Plaintiffs' allegations fail to state a claim for legal malpractice upon which relief can be granted because the Plaintiffs have failed to plead that the Defendant breached a duty it owed to the Debtor. The Plaintiffs allege that the Defendant committed legal malpractice by: 1) providing "substantial legal assistance" in the AIC

---

[2]The Parties agree that the laws of Illinois and Indiana do not differ on either legal malpractice or breach of fiduciary duty. Because "a malpractice claim against a firm's lawyer is determined by the law of the state where the services are performed," *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002), the Court will apply the substantive law of Illinois—the state where the Defendant's attorneys performed the legal services in question—although it appears the parties are correct that there is no conflict.

12

Sale/Leaseback transaction in which the Debtor paid the Defendant $382,000 for its legal fees when the Defendant "knew or should have known that there were serious questions about the financial viability of [the Debtor] as an operating entity"; 2) evolving and proposing the redemption transaction in which the Debtor agreed to pay the Defendant over $883,000 for legal services performed for Wright Capital when the Defendant knew that the Debtor's financial condition was "perilous"; and 3) providing "substantial legal assistance" in the SSFHS Sale/Leaseback transaction when the Defendant "knew or should have known that [the Debtor's] financial condition remained 'perilous.'" The Plaintiffs allege generally that each of these transactions was disadvantageous to the Debtor's financial position, which the Plaintiffs characterize at all relevant times as insolvent. The Court agrees that the Plaintiffs have not stated a claim for legal malpractice in any of these instances because the Plaintiffs have failed to plausibly plead that the Defendant breached its duties to the Debtor. The Plaintiffs' claims against the Defendant are that the Defendant provided legal assistance and proposed a transaction, not that the legal services provided were in any way deficient. The Plaintiffs do not suggest that the Defendant breached a standard of care in the legal services it provided; rather, the Plaintiffs are alleging, in essence, that the Defendant should not have provided legal services at all because the transactions were disadvantageous to the Debtor, and because the Defendant represented the Debtor. The Plaintiffs also allege, however, that the Debtor itself approved every legal action taken by the Defendant on behalf of the Debtor. The advice the Plaintiffs challenge, then, is not the legal advice provided by the Defendant. Rather, the Plaintiffs are challenging the Defendant's failure to give the Debtor business advice—specifically, the Defendant's failure to advise the Debtor against engaging in the AIC Sale/Leaseback transaction, the redemption

13

transaction, and the SSFHS Sale/Leaseback transaction. Such allegations do not state a claim for

legal malpractice.

The Seventh Circuit discussed a similar situation in *Maxwell v. KPMG LLP*, 520 F.3d

713 (7th Cir. 2008). In a bankruptcy case where a Chapter 7 trustee sued the auditors who had

audited a portion of the bankrupt entity, the *Maxwell* court discussed the professional duty owed

by an auditor:

> It was the duty to protect creditors of and investors in [the bankrupt company] from
> being misled to their harm by financial statements issued by [the bankrupt company]
> that contained errors that would be material to a creditor or an investor. It was not
> a duty to give the company business advice, such as advice on whether to acquire
> another company. The knowledge required to give such advice is possessed by the
> business itself and by business-consulting firms, as distinct from auditors.

*Id.* at 716–17. Concluding that the bankrupt company "wants to make its auditor the insurer

against the folly (as it later turned out) of a business decision . . . unrelated to what an auditor is

hired to do," the *Maxwell* court stated that "[n]othing in Illinois law permits such an attempt to

succeed." *Id.* at 717. Similarly, in *In re Greater Southeast Community Hospital Corp.*, 333 B.R.

506 (Bankr. D.D.C. 2005), the court rejected legal malpractice claims by a bankruptcy trustee

against lawyers where the complaint alleged that the lawyers "fail[ed] to inform the Debtors of

the consequences associated with the Debtors' deepening insolvency," *id.* at 529. The Court

found that such a claim failed as a matter of law because the attorney client relationship did not

include "*business* advice given to the Debtors. Rather, the [lawyers] had an obligation to exercise

reasonable care only with respect to their *legal* advice." *Id.* Further, the court stated that "a

company's acquisition of additional debt, by itself, is not a legal wrong, and therefore has no

'consequences' for the company of a legal nature." *Id.* at 530.

The Court agrees that the Defendant did not have a duty to give the Debtor business advice as to the advisability of its business transactions. The Plaintiffs assert that the directors of the Debtor approved each of the transactions about which the Plaintiffs complain. It was the directors of the Debtor, and not the Defendant, who possessed the knowledge necessary to give business advice. *Maxwell*, 520 F.3d at 716–17. The Second Amended Complaint is devoid of allegations that can sustain a claim for legal malpractice.

The Plaintiffs insist that they have pled more than a failure to give proper business advice. They argue that they have alleged the Defendant acted as part of a conspiracy with the insiders of the Debtor to defraud the Debtor itself to the benefit of the insiders and the Defendant. The Plaintiffs insist this conspiracy to loot the Debtor makes out a claim for legal malpractice. But the Court finds that the Plaintiffs are now attempting to stretch the allegations of the Second Amended Complaint too far. The Second Amended Complaint alleges that the Defendant committed legal malpractice by providing legal services that were disadvantageous to the Debtor in the AIC Sale/Leaseback transaction, by evolving and structuring the redemption transaction which was disadvantageous to the Debtor, and by providing legal services that were disadvantageous to the Debtor in the SSFHS Sale/Leaseback transaction. Nowhere does the Second Amended Complaint contain an allegation that the Defendant participated in a conspiracy with insiders of the Debtor to loot its assets. The Second Amended Complaint does allege that the Defendant knew that the Debtor's financial condition was perilous when it performed the legal services in question. But providing legal services to an insolvent client under the approval of its directors and actively conspiring to loot the assets of a client are two very different things. The Second Amended Complaint alleges the former without alleging the latter.

15

Consequently, the authorities cited by the Plaintiffs in support of their arguments are distinguishable because they concern cases where the lawyers were alleged to have participated in fraudulent conduct. *See Kopka v. Kamensky & Rubenstein*, 821 N.E.2d 719, 725 (Ill. App. Ct. 2004) (noting that under Illinois law there is no "*per se* bar that would prevent imposing liability upon attorneys who knowingly and substantially assist their clients in the commission of a tort"); *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 769 (Ill. App. Ct. 2003) (overturning dismissal of claims against law firm for aiding and abetting a breach of fiduciary duty, aiding and abetting a scheme to defraud, and aiding and abetting a scheme of fraudulent inducement); *Dempsey v. Sternik*, 498 N.E.2d 310, 312–13 (Ill. App. Ct. 1986) (upholding finding that attorney was involved in a conspiracy). The Plaintiffs also discuss *Clark v. Allen*, 139 F.3d 888(4th Cir. 1998) (Table) , a case in which the Fourth Circuit upheld a jury finding of professional negligence by attorneys because there was evidence that they breached the standard of care for attorneys. As the Defendant notes, the Plaintiffs have not alleged that the Defendant breached the standard of care in the legal advice it provided to the Debtor. Further, *Clark* involved attorneys who were also corporate insiders who breached their fiduciary duties to the corporation. There is no allegation that attorneys from the Defendant were also corporate insiders of the Debtor. Thus, the Court finds *Clark* distinguishable from the Plaintiffs' legal malpractice claim.

The Plaintiffs also discuss at length the case of *In re JTS Corp.*, 305 B.R. 529 (Bankr. N.D. Cal. 2003). In *JTS*, a bankruptcy trustee sued a lawyer who represented the debtor in a real estate transaction for failing to advise the debtor that it was selling certain real estate for $5–6 million less than its appraised value. The court found the attorney liable for legal malpractice. *Id.*

16

at 552. The *JTS* court stated that "attorneys should be prepared to volunteer legal opinions when necessary to further a client's objectives and should provide advice regarding alternatives where the failure to consider them could result in adverse consequences." *Id.* Notably, the *JTS* court found that it was "reasonable to conclude from the evidence that [the debtor] would have acted differently if it had been cautioned that a sale at less than fair market value might breach duties [debtor] owed to its creditors." *Id.* The Plaintiffs insist that just as the attorney in *JTS* should have given preemptive legal advice, so the Defendant should have advised the Debtor of the consequences of its transactions. The Court distinguishes *JTS* for two reasons. First, as the Defendant argues, *JTS* turned on negligence in legal advising which breached the standard of care because of legal advice that was not given. But the Plaintiffs have not alleged that the Defendant should have given additional legal advice. Rather, as discussed above, the Plaintiffs allege that the Defendant should have given additional business advice. The Plaintiffs have failed to allege that the advice not given by the Defendant was legal advice as in *JTS.* Second, the *JTS* holding depended on the reasonable inference that the debtor would have acted differently if it had been properly advised by the lawyer. The Second Amended Complaint allows for no such inference. On the contrary, the Second Amended Complaint contains allegations that the Old Management and the New Management purposely took actions detrimental to the financial welfare of the Debtor. It is not a reasonable inference from the Second Amended Complaint that these insiders would have acted differently if the Defendant had advised them that certain financial transactions would be disadvantageous to the Debtor. Instead, the Second Amended Complaint alleges that these insiders engaged in the transactions precisely because they were disadvantageous to the Debtor. For these reasons, the Court finds *In re JTS Corp.*

17

distinguishable.

The Plaintiffs raise a number of additional arguments. The Plaintiffs argue that the Defendant owed its duty to the Debtor, and not to its insiders. *Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1248 (7th Cir. 1990). This is true, but is not sufficient to state a claim that the Defendant breached its duty to the Debtor. The Plaintiffs argue that the Defendant owed a higher duty to the Debtor because it is a fair inference that the Defendant knew of the Debtor's perilous financial condition from the beginning of the Defendant's involvement in the Debtor's affairs. The only authority the Plaintiffs cite for this proposition is *Willner's Fuel Distributors, Inc. v. Noreen*, 882 P.2d 399 (Alaska 1994). The *Noreen* court held that "if an attorney represents both a dissolved or insolvent corporation and a director or officer of that firm, and if the attorney controls corporate assets, then the attorney must protect the financial rights of creditors to these assets." *Id.* at 406. Because there is no suggestion that the Defendant actually controlled the assets of the Debtor, the Court finds the *Noreen* court's holding distinguishable from the Plaintiffs' allegations.

The Plaintiffs argue that whether the Defendant owed a duty to give business advice or not, it was liable for the advice it gave once it "evolved and proposed" the redemption transaction (Mem., ECF No. 17-2 at 34), volunteering business advice concerning the survivability of the Debtor. *See Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1031 (7th Cir. 2000) ("A law firm . . . that represents itself to have special competence in a particular matter commits itself to a standard of care above the average for the profession as a whole."). The Defendant responds that nothing about proposing the redemption transaction distinguished it from a law firm's normal function—providing legal advice. The Court agrees that, based on the

18

pleadings, it appears that the Defendant's proposal concerning the redemption transaction did not create a special duty on the part of the Defendant. Indeed, the Defendant did not overstate the redemption transaction's potential for success, merely stating that in the Defendant's judgment the redemption transaction provided the Debtor "the greatest opportunity for survivability." Thus, proposing the redemption transaction did not suggest a special competence on the part of the Defendant, and created no special duty.

Finally, the Plaintiffs argue that the Defendant had a conflict of interest in the redemption transaction sufficient to call that transaction into question. In support, they cite *Klaskin v. Klepak*, 534 N.E.2d 971, 975 (Ill. App. Ct. 1989), a case discussing financial transactions between attorneys and clients. The Court finds that nothing in *Klaskin* calls into question the redemption transaction, which, as discussed below, was not a transaction between the Defendant and the Debtor. As the Defendant argues, the document produced by the Plaintiffs as part of the Second Amended Complaint shows that the Debtor was not a party to the redemption transaction. Accordingly, the Court finds that the Second Amended Complaint does not plausibly suggest a conflict of interest in the redemption transaction sufficient to heighten the Defendant's duty or call the transaction into question.

The allegations in Count V of the Second Amended Complaint are that the Defendant committed legal malpractice by providing legal services and by evolving and proposing a transaction. The Second Amended Complaint does not allege that the Defendant breached the standard of care by providing deficient legal advice. The Second Amended Complaint does not allege that the Defendant "facilitated (and later participated in) the looting of its client." (Pls.' Resp. 12, ECF No. 13.) It is not a reasonable inference from the pleadings that the Defendant

engaged in a conspiracy to loot the assets of the Debtor. Rather, the pleadings reasonably suggest that the insiders of the Debtor engaged in various transactions knowing full well that they would be financially disadvantageous to the Debtor, and would not have acted differently even if the Defendant had advised against them. Because the Second Amended Complaint does not plausibly suggest legal malpractice by the Defendant, the Court will grant the Motion to Dismiss concerning Count V.

**B.       The Plaintiffs' Count VI Claim for Breach of Fiduciary Duty Fails to State a Claim Upon Which Relief Can Be Granted**

The Defendant argues that Count VI of the Second Amended Complaint should also be dismissed pursuant to Rule 12(b)(6). Specifically, the Defendant argues that the Plaintiffs' Count VI claim for breach of fiduciary duty is deficient because it does not state how the Defendant placed the interests of Wright Capital above the interests of the Debtor, or how it "maneuvered to have [the Debtor] pay for work that the firm performed for other clients." The Defendant argues that the Plaintiffs have failed to plead facts plausibly stating a claim for breach of fiduciary duty. Further, the Defendant argues, the Second Amended Complaint fails to state a claim for breach of fiduciary duty concerning the redemption transaction because the document produced by the Plaintiffs and attached to the Second Amended Complaint shows that the Debtor was not a party to the redemption transaction. The Plaintiffs respond that the Defendant breached its fiduciary duty of loyalty and its fiduciary duty not to prefer its own interests or the interests of another client over the interests of the Debtor. The Plaintiffs argue that the Defendant breached these duties in the redemption transaction by ensuring that the Debtor paid $883,000 to the

Defendant for work the Defendant had performed for Wright Capital, thus preferring both its own interests and those of Wright Capital to those of the Debtor. The Plaintiffs argue that the Defendant breached these duties in the AIC Sale/Leaseback transaction by structuring a transaction that benefitted Wright Capital and not the Debtor, and by receiving from the Debtor $382,000 in legal fees for work performed for Wright Capital and Heartland Memorial Holdings, even though parties to the transaction were to bear their own legal fees. The Defendant replies that it could not have breached a fiduciary duty to the Debtor by structuring the redemption transaction, to which the Debtor was not a party. The Defendant also replies concerning the AIC Sale/Leaseback transaction that the transaction did benefit the Debtor, and that the claimed breach of fiduciary duty is insufficient to state a claim upon which relief can be granted.

To state a cause of action for breach of fiduciary duty, a plaintiff must allege: "(1) a fiduciary duty on the part of the defendant and (2) a breach of that duty that (3) proximately caused (4) an injury." *Visvardis v. Ferleger*, 873 N.E.2d 436, 442 (Ill. App. Ct. 2007) (citing *In re Estate of Lis*, 847 N.E.2d 879, 885 (Ill. 2006)).[3]

The Plaintiffs allege that the Defendant breached its fiduciary duty to the Debtor in the AIC Sale/Leaseback transaction by structuring a deal that benefitted Wright Capital to the detriment of the Debtor. The Court agrees with the Defendant that these allegations of the Second Amended Complaint are insufficient to state a claim upon which relief can be granted. Most notably, the Plaintiffs argue that the AIC Sale/Leaseback allowed Wright Capital to purchase an ownership interest in the Debtor "without risking its own money." (Pls.' Resp. 14.)

---

[3]As noted above, the parties agree that the law in Indiana and Illinois does not differ with respect to legal malpractice or the breach of a fiduciary duty. For the reasons discussed above, the Court will apply the law of Illinois.

But as the Defendant notes, this is not true. Wright Capital loaned the Debtor $2.5 million of its own funds. Thus, although Wright Capital purchased iHealthcare with funds generated from the AIC Sale/Leaseback, it is not accurate to state that Wright Capital did not risk its funds on the success of the Debtor. It appears from the pleadings that the Debtor, Wright Capital, and the Defendant all benefitted from the AIC Sale/Leaseback transaction. Further, it appears that the Debtor itself approved the transaction. Nothing about the allegations in the Second Amended Complaint sets forth the breach of a fiduciary duty by the Defendant as part of the AIC Sale/Leaseback. Therefore, the Plaintiffs have failed to state a claim for breach of fiduciary duty concerning the AIC Sale/Leaseback transaction.

The Plaintiffs allege that the Defendant breached its fiduciary duty to the Debtor in the redemption transaction by structuring a deal in which the Debtor became obligated to pay the Defendant $883,000 in legal fees for work that the Defendant had performed for Wright Capital. The Court agrees with the Defendant, however, that the document setting forth the details of the redemption transaction states that Heartland Memorial Holding Company, Inc., and not the Debtor, "shall assume and be responsible for payment of" the Defendant's invoices. (Letter, ECF No. 17-2 at 36.) Thus, although the Plaintiffs allege that the Debtor became obligated to pay Wright Capital's legal bills, the Plaintiffs have pled themselves "out of court by pleading facts that show that [they have] no legal claim." *Atkins*, 631 F.3d at 832. The Plaintiffs' own document shows that the Debtor was not a party to the redemption transaction; it is, therefore, not a reasonable inference to be drawn in favor of the Plaintiffs that the Debtor became obligated to pay the Defendant's legal fees as part of the redemption transaction.

As to the Plaintiffs' allegation that "on information and belief" the Debtor actually paid

22

legal invoices for over $883,000 to the Defendant (2d Am. Compl. ¶ 38), it is insufficient to state a claim for breach of fiduciary duty. The Plaintiffs have not alleged that the Debtor paid legal fees to the Defendant because the Defendant breached a fiduciary duty to the Debtor. Instead, the Plaintiffs have alleged that Heartland Memorial Holding Company, Inc., became obligated to pay the Defendant's legal invoices and that the Debtor actually paid them. The pleadings do not plausibly allege that the Defendant preferred its own interests or the interests of Wright Capital to those of the Debtor in the redemption transaction because the pleadings show that the Debtor was not a party to the redemption transaction at all. Heartland Memorial Holding Company agreed to pay the invoices. The Plaintiffs argue that the document setting out the details of the redemption transaction was addressed to a representative of the Debtor at the time the Defendant represented the Debtor. But the Court finds these details to be irrelevant because the meaning of the document is clear concerning the redemption transaction. The pleadings do not plausibly suggest that the Defendant breached a fiduciary duty to the Debtor when the pleadings show that the Debtor was not a party to the redemption transaction, and that another party became obligated for the payments about which the Plaintiffs complain. Thus, the Second Amended Complaint fails to state a claim upon which relief can be granted concerning the redemption transaction.


C.      **The Doctrine of *In Pari Delicto***

The Defendant argues that Counts V and VI of the Second Amended Complaint should

also be dismissed because they are barred by the doctrine of *in pari delicto*.[4] The Seventh Circuit

has described this equitable defense as "the idea that, when the plaintiff is as culpable as the

defendant, if not more so, the law will let the losses rest where they fell." *Peterson v. McGladrey*

*& Pullen, LLP*, 676 F.3d 594, 596 (7th Cir. 2012). Both Illinois and Indiana recognize the

defense of *in pari delicto*. *See King v. First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1173

(Ill. 2005); *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. Ct. App. 1975). However, under the

adverse interest exception, *in pari delicto* does not apply if "the corporate officers act entirely for

their own interests and the actions do not benefit the corporation." *Grede v. McGladrey & Pullen*

*LLP*, 421 B.R. 879, 886 (Bankr. N.D. Ill. 2009). But any benefit to the debtor—however

slight—works to revoke the adverse interest exception. *In re Scott Acquisition Corp.*, 364 B.R.

562, 568 (Bankr. D. Del. 2007) ("[C]ourts do not apply the adverse interest exception unless the

agent acts entirely in his or her own interest with no benefit to the principal."). The sole-owner

doctrine also works to prevent application of the adverse interest exception. This doctrine applies

when the agent has "unbreakable communication with his principal." *McRaith v. BDO Seidman,*

*LLP*, 909 N.E.2d 310, 333 (Ill. App. Ct. 2009). In such a circumstance, where "the looting agent

and his principal are one and the same, the principal clearly has knowledge of its agent's actions

at all times," *id.*, and therefore "it is only fair to impute the self-dealing conduct of the looter to

the looted corporation," *id.* (quoting *Reider v. Arthur Anderson, LLP*, 784 A.2d 464, 472 (Conn.

Super. Ct. 2001)).

---

[4]"[T]he [L]atin phrase *in pari delicto* literally means of equal fault. The expression in pari delicto is a portion of the longer Latin sentence, In pari delicto potior est conditio defendentis, which means that where the wrong of both parties is equal, the position of the defendant is the stronger." *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, No. 1:03-CV-0132-DFH, 2004 WL 771230, at *7 (S.D. Ind. Mar. 24, 2004) (quotation marks and citations omitted).

The Defendant urges that *in pari delicto* bars the Plaintiffs' claims in Counts V and VI because directors of the Debtor approved of the AIC Sale/Leaseback transaction, the redemption transaction, and the SSFHS Sale/Leaseback transaction. Thus, Plaintiff Heartland Memorial Hospital (the Debtor) may not assert claims against the Defendant. Further, the Defendant argues, because Plaintiff Abrams (the Trustee) stands in the place of the Debtor under the bankruptcy code, his claims against the Defendant are also barred just as if they had been asserted by the Debtor. Finally, the Defendant argues that the adverse interest exception to *in pari delicto* is not applicable because the Second Amended Complaint alleges that the Debtor received some benefit from the alleged wrongdoing, and because the directors of the Debtor were one and the same as the Debtor under the sole-owner doctrine. The Plaintiffs argue in response that, on public policy grounds, Illinois courts would not apply *in pari delicto* against an innocent trustee, and therefore this Court should also not apply the doctrine against Plaintiff Abrams. The Plaintiffs also respond that the adverse interest exception to *in pari delicto* should apply because the insiders were acting adversely to the interests of the Debtor, and because the sole-owner doctrine does not apply. The Defendant replies that the Seventh Circuit has squarely held that a defendant may assert an *in pari delicto* defense against a bankruptcy trustee in Illinois.

As discussed below, the Court finds, first, that the Defendant may assert the defense of *in pari delicto* against the Plaintiffs; but second, that application of *in pari delicto* would be premature at this stage of the proceedings.

**1.** *Illinois Law Supports Application of* **In Pari Delicto** *to a Bankruptcy Trustee*

The Plaintiffs' first argument against *in pari delicto* is that it should not apply against an innocent bankruptcy trustee. Citing *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995), the Plaintiffs argue that *in pari delicto* "does not serve [its] equitable purpose when the wrongdoer has been removed and will not profit from the lawsuit." (Pls.' Resp. 20.) Presumably the Plaintiffs are referring to the Seventh Circuit's statement in *Scholes* that "the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated," *Scholes*, 56 F.3d at 754. Pointing to decisions of Illinois courts that have limited application of the doctrine of *in pari delicto* on public policy grounds, including litigation involving the Debtor and Plaintiff Abrams, the Plaintiffs urge that Illinois courts would not apply the doctrine as against the Trustee and therefore this Court should also not apply *in pari delicto*. The Defendant replies that the Plaintiffs misunderstand the Seventh Circuit's recent holding in *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594 (7th Cir. 2012).

In *Peterson*, the court vacated and remanded a district court's dismissal of claims against the auditors for bankrupt mutual funds. The district court had dismissed the claims on the basis of *in pari delicto*, but the Seventh Circuit found that the dismissal relied on an inappropriate inference by the district court. As part of its analysis, the court also addressed whether a federal bankruptcy trustee is susceptible to the defense of *in pari delicto* at all. The court began by noting that "Illinois would allow the defense if a receiver for the [bankrupt mutual funds] were suing under state law." *Id.* at 597. The court continued by discussing § 541(a) of the bankruptcy code, 11 U.S.C. § 541(a), outlining the property contained in a bankruptcy estate. Noting that "an estate in bankruptcy includes all of the debtor's 'property', a word that comprises legal claims," the court stated that "'property' normally is defined by state law—and in Illinois a claim

for damages is limited by defenses such as *in pari delicto*." *Peterson*, 676 F.3d at 598. Affirming

that state law and not federal bankruptcy law defines the "property" entering a bankruptcy estate,

and noting that the federal judiciary may not create limits to state law legal claims under current

United States Supreme Court precedents, the court held as follows:

> We therefore agree with the conclusion of every other court of appeals that has
> addressed this subject and hold that a person sued by a trustee in bankruptcy may
> assert the defense of *in pari delicto*, if the jurisdiction whose law creates the claim
> permits such a defense outside of bankruptcy.

*Id.* The court also noted that its statement from *Scholes*, that "the defense of *in pari delicto* loses

its sting when the person who is *in pari delicto* is eliminated," *Scholes*, 56 F.3d at 754, was

"dictum," *Peterson*, 676 F.3d at 599. The *Peterson* court distinguished *Scholes* because *Scholes*

was decided under Illinois state law concerning a receivership, because "*Scholes* was not a

bankruptcy proceeding," and because "*Scholes* did not entail a *pari delicto* defense." *Id.*

  The Court agrees with the Defendant that *Peterson* squarely holds that a defendant may

assert the defense of *in pari delicto* against a bankruptcy trustee in Illinois. The State of Illinois

recognizes the defense of *in pari delicto*. *Id.* at 597. Accordingly, it appears that if the Debtor

were suing the Defendant outside of bankruptcy, the Defendant could assert the defense of *in*

*pari delicto* against the Debtor under Illinois law, and the Plaintiffs have not suggested

otherwise. Therefore, under the holding in *Peterson*, the Defendant may assert the defense of *in*

*pari delicto* against the Trustee, Plaintiff Abrams. Further, as the Defendant notes, the Debtor is

a named plaintiff in this action and the Plaintiffs have offered no argument for why the

Defendant cannot assert *in pari delicto* against the Debtor. Accordingly, the Defendant may

properly assert the defense of *in pari delicto* against both Plaintiffs in this federal cause of

action. The Plaintiffs' arguments to the contrary are unpersuasive. The *Peterson* court noted that

some Illinois courts have limited the doctrine of *in pari delicto* for public policy reasons, but also noted that public policy is not a basis for limiting the definition of state law claims and defenses given precedents of the United States Supreme Court. *See Peterson*, 676 F.3d at 598. Because Illinois would allow the Defendant to assert the defense of *in pari delicto* against the Debtor, and because the Trustee stands in the same position as the Debtor pursuant to § 541 of the bankruptcy code, the *Peterson* holding clearly allows the Defendant to assert the defense of *in pari delicto* against the Trustee as well.

2.      ***It Would Be Premature to Apply the Doctrine of* In Pari Delicto**

The Plaintiffs argue that application of *in pari delicto* is premature at the motion to dismiss stage. In support, they cite *Diamond Mortgage Corp. of Illinois v. Sugar*, 913 F.2d 1233 (7th Cir. 1990), in which the Seventh Circuit declined to dismiss claims of legal malpractice and breach of fiduciary duty under the doctrine of *in pari delicto* where "substantial question" remained regarding the alleged fraud, *id.* at 1248, and where the facts of the case were "insufficiently developed," *id.* at 1248 n.14. The Defendant does not respond to the Plaintiffs' argument on this point. The Court finds that the Plaintiffs are correct. It would be inappropriate to apply the doctrine of *in pari delicto* at this stage of the proceedings. Substantial questions remain concerning the relationship of the Defendant to the directors of the Debtor and to other parties, and concerning the defrauding of the Debtor. Morever, the record is insufficiently developed to apply an equitable doctrine that could have the effect of foreclosing all claims. The Court will take up the question of the *in pari delicto* defense at the appropriate stage in this litigation, upon request by the Defendant. Accordingly, the Court will not grant the Defendant's

Motion to Dismiss on the basis of the doctrine of *in pari delicto*, and the Court need not discuss the application of that doctrine, the adverse interest exception, or the sole-owner doctrine.

**D.      Opportunity to Amend**

A court "should freely give leave [to amend pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(1)(B)(2). *See Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("District courts routinely do not terminate a case at the same time that they grant a defendant's motion to dismiss; rather, they generally dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint."); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Com'n*, 377 F.3d 682, 687 (7th Cir. 2004) (stating that the general rule is that "the district court should grant leave to amend after granting a motion to dismiss"). However, a court should not grant leave to amend "where the amendment would be futile." *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011) (quoting *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008)).

The Plaintiffs argue that their claims are, in substance, claims that the Defendant engaged in a conspiracy to loot and defraud the Debtor. As discussed above, the Plaintiffs have not stated such claims in Counts V and VI of their Second Amended Complaint, and dismissal of those claims is appropriate. However, it appears that opportunity to amend the pleadings would allow the Plaintiffs to craft claims that seek relief more appropriate to the undeveloped record before the Court, and it does not appear that amendment would be futile. Accordingly, the Court will dismiss without prejudice and grant the Plaintiffs fourteen days to amend their claims against the Defendant by raising any claims for conspiracy or fraud in accordance with the strictures of the Federal Rules of Civil Procedure and applicable caselaw, if the Plaintiffs choose to pursue such

claims.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion to Dismiss Counts V and VI of Second Amended Complaint [ECF No. 17-2 at 54–56]. Counts V and VI are DISMISSED WITHOUT PREJUDICE, with leave to re-file within fourteen days of the date of this Opinion and Order. If the Plaintiffs do not amend their pleadings within fourteen days, this dismissal of Counts V and VI will become final and with prejudice.

SO ORDERED on June 12, 2013.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION