# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| DAVID ABRAMS, *not individually but solely as the Liquidating Trustee and court-appointed manager of Heartland Memorial Hospital, LLC*, and HEARTLAND MEMORIAL HOSPITAL, LLC, the Debtor, an Indiana limited liability company,<br><br>    Plaintiffs,<br><br>v.<br><br>DLA PIPER (US) LLP, *a Maryland limited liability partnership*,<br><br>    Defendant. | CAUSE NO.: 2:12-CV-19-TLS |

## OPINION AND ORDER

This matter is before the Court on DLA Piper's Motion to Dismiss Counts V and VI of Fourth Amended Complaint [ECF No. 23]. DLA Piper, a law firm, has been sued in an adversary proceeding by the liquidating trustee of a debtor, Heartland Memorial Hospital, LLC. For the reasons set forth below, the Court denies the Defendant's Motion.

## PROCEDURAL BACKGROUND

The Plaintiff is seeking to avoid and recover from DLA Piper certain fraudulent transfers and preferences made by the debtor. The Plaintiff also asserted, in a Second Amended Complaint, claims for legal malpractice and breach of fiduciary duty. Upon motion by the Defendant, the Court found that these additional counts did not state claims upon which relief

could be granted, and dismissed those counts without prejudice, and with leave to re-file.[1]

In response, the Plaintiff filed a Fourth Amended Complaint, which added claims for breach of fiduciary duties (Count VI), and aiding and abetting breach of fiduciary duties (Count V). The Defendant now seeks to dismiss these claims on grounds that the leave to amend the Court granted was very specific and did not include the right to re-plead breach of fiduciary duty claims or to file a claim for aiding and abetting a breach of fiduciary duty. The Defendant also argues that the claim for breach of fiduciary duty that is asserted in the Fourth Amended Complaint is no different from the breach of fiduciary duty claim that the Court already dismissed, and thus fails to state a claim upon which relief can be granted. The Defendant argues that the aiding and abetting claim is not plausible because it would require that the Defendant assisted insiders in looting an entity over which its client intended to gain operational control and had already made a substantial loan to. The Plaintiff counters on the procedural issues, and points to new facts he alleged to correct the deficiencies noted by the Court in its dismissal order.

**COMPLAINT ALLEGATIONS**

The Court draws the following facts from the Fourth Amended Complaint. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009) (stating that "for purposes of the motion to dismiss we accept all factual allegations in the complaint and draw all reasonable inferences from those facts" in favor of the plaintiffs).

Heartland Memorial Hospital (Heartland), a limited liability company organized in

---

[1] For a more complete procedural background, see the Court's June 12, 2013, Opinion and Order [ECF No. 18].

Indiana, operated a number of for-profit, physician owned, healthcare practices in Illinois and Indiana, including a surgery center and hospital in Munster, Indiana. Heartland's sole member was its parent corporation, iHealthcare, which was organized in 2002 and was the sole owner of Heartland's equity. Heartland was managed by the directors of iHealthcare, who also managed iHealthcare without apparent regard for the independent corporate statuses of iHealthcare and Heartland.

In 2002, Heartland began an expansion of its hospital facility. To pay for the expansion, Heartland entered into a sale/leaseback agreement with Munster Medical Holdings, LLC. Heartland sold its main hospital facility to Munster Medical Holdings for $30 million and agreed to lease the facility for almost $300,000 per month for the first five years.

By the middle of 2005, Heartland was insolvent or essentially so. It was unable to pay its creditors and, by the end of 2005, owed $1.9 million for unpaid taxes on withheld wages.

Members of iHealthcare's board of directors contacted Wright Capital Partners, an investment banking firm, who expressed an interest in purchasing the iHealthcare shareholders' equity interests. In October 2005, certain of the iHealthcare shareholders agreed to sell their individual shares in iHealthcare to Wright Capital Partners for about $25 million in cash and debentures. The transaction was never consummated because Wright Capital Partners lacked the necessary funds.

Meanwhile, Heartland's financial condition had continued to worsen and, by October 2005, it needed an immediate infusion of cash. Wright Capital Partners offered to lend Heartland up to $2.5 million in a revolving line of credit, provided that Leroy Wright, the owner of Wright Capital Partners, was placed in control of Heartland along with Wright's business associates,

Alfred Sharp and Allen Hill. On October 10, 2005, Wright became a part of the joint committee operating Heartland. DLA Piper, which represented Wright Capital Partners, began representing Heartland as well when Wright took control of the hospital facility. DLA Piper provided a wide range of legal services to the hospital, frequently billing over $100,000 a month. With broad access to information about Heartland, DLA Piper was fully aware of Heartland's perilous financial state.

The shareholders of iHealthcare, including its directors who managed Heartland agreed to sell their iHealthcare stock to Wright for $25 million, but because Wright Capital did not have sufficient cash on hand, the iHealthcare shareholders agreed to a leveraged buyout. In this transaction, agreed to by the joint managers of Heartland and iHeathcare, Heartland's assets were sold and $7 million of the cash generated by the sale was transferred to iHealthcare's shareholders in exchange for transferring their iHealthcare stock to Wright Capital. The hospital leased back the real estate assets that it sold for twice the market rate. After transfer of $7 million to the equity owners, payment of legal fees, costs of the transaction, and pay-offs on the mortgages for the sold property, little of the purchase price was left for Heartland to cover its new monthly lease obligations.

DLA Piper performed all the legal services necessary to negotiate and document the sale and leaseback transaction. In connection with the leveraged buyout, DLA Piper conducted extensive due diligence on behalf of Wright Capital. DLA Piper observed that Heartland was being run by a joint committee that ignored corporate formalities, which put it at risk for actions seeking to pierce its corporate veil as the mere alter ego of iHealthcare.

Heartland Memorial Holdings, formed by Wright Capital, Wright, Sharp, and Hill,

became the grandparent organization of Heartland. Among the three entities—Heartland Memorial Holdings, iHealthcare, and Heartland—only Heartland was an operating entity, and thus the only entity capable of generating cash.

Within four months after the Wright merger closed, DLA Piper recognized that Heartland was in financial trouble, and proposed a plan to remove Wright as Heartland's manager. As part of the plan, Heartland Memorial Holdings agreed to assume responsibility for payment of over $883,000 in unpaid legal fees for work DLA Piper had performed for Wright Capital Partners. DLA Piper sought and received at least partial payment from Heartland.

In October 2006, Heartland sold its main hospital campus and most of its remaining assets to the Sisters of St. Francis Health Services. DLA Piper received payment around the time of this transaction, and an additional payment in January 2007.

On January 31, 2007, creditors of Heartland filed an involuntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Indiana, naming Heartland as debtor. On March 2, 2007, Heartland converted the case to a Chapter 11 proceeding. On November 19, 2008, the bankruptcy court approved Heartland's liquidating plan of reorganization and appointed the Plaintiff David Abrams as liquidating trustee, manager, and designated representative.

**DISCUSSION**

**A.     Opportunity to Amend**

The Defendant argues that Counts V and VI of the Fourth Amended Complaint do not fit within the specific leave to amend the Court granted when it dismissed the Plaintiff's legal

5

malpractice and breach of fiduciary duty claims. In its previous order, the Court acknowledged that leave should be freely granted following a dismissal unless the amendment would be futile, and reasoned as follows with respect to the malpractice and breach of fiduciary duty claims:

> The Plaintiffs argue that their claims are, in substance, claims that the Defendant engaged in a conspiracy to loot and defraud the Debtor. As discussed above, the Plaintiffs have not stated such claims in Counts V and VI of their Second Amended Complaint, and dismissal of those claims is appropriate. However, it appears that opportunity to amend the pleadings would allow the Plaintiffs to craft claims that seek relief more appropriate to the undeveloped record before the Court, and it does not appear that amendment would be futile. Accordingly, the Court will dismiss without prejudice and grant the Plaintiffs fourteen days to amend their claims against the Defendant by raising any claims for conspiracy or fraud in accordance with the strictures of the Federal Rules of Civil Procedure and applicable caselaw, if the Plaintiffs choose to pursue such claims.

(6/12/13 Opinion & Order 29–30, ECF No. 18.)

The Plaintiff asserts that it did not interpret the Court's Order as instructing it to file the exact claims mentioned, and no others. Instead, it pled the theories that best fit the facts. To this end, he crafted claims more appropriate to the undeveloped record by simplifying, streamlining, or enhancing basic factual allegations, and then framing a claim for aiding and abetting a breach of fiduciary duty to replace the legal malpractice claim, and by adding facts to address the specific defects the Court had identified in the breach of fiduciary duty claim.

The Plaintiff's argument is well taken. The Court found the Second Amended Complaint to be lacking, interpreted the Plaintiff's legal memoranda to be alleging that the Defendant engaged in a conspiracy to loot and defraud Heartland, and granted the Plaintiff leave to amend its pleading in the spirit of *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("District courts routinely do not terminate a case at the same time that they grant a defendant's motion to dismiss; rather, they generally dismiss the plaintiff's complaint without prejudice and give the

6

plaintiff at least one opportunity to amend her complaint.") and *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Com'n*, 377 F.3d 682, 687 (7th Cir. 2004) (stating that the general rule is that "the district court should grant leave to amend after granting a motion to dismiss"). The identification of possible claims for conspiracy and fraud lent support to the Court's finding that an amendment did not appear futile, despite there being no plausible claim in the current version of the pleadings for breach of fiduciary duty or malpractice. The identification was not intended to be an exhaustive list of possible claims, for even where a court is "skeptical about the prospects for success" it should generally give the plaintiff one opportunity to try to cure problems after a successful motion to dismiss. *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). The Court provided that opportunity. If the amendments fail to state a claim upon which relief may be granted, the procedural mechanism of a Rule 12(b)(6) motion to dismiss, which the Defendant has invoked, is sufficient to protect the Defendant's rights. If the matter were before the Court on a motion for leave to amend, the Court could deny leave if it found the proposed amendment failed to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss. *Crestville Vill. Apartments v. U.S. Dep't of Housing and Urban Dev.*, 383 F.3d 552, 558 (7th Cir. 2004). Either way, the analysis is the same. The Court, rather than automatically excluding the Plaintiff's pleading, will proceed to consider whether the allegations state a plausible claim for relief.

B.     **Sufficiency of the Pleadings**

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. Requirements for stating a claim under the federal pleading standards are

7

straight forward. A pleading that states a claim for relief must set forth "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for relief sought." Fed. R. Civ. P. 8(a). In considering motions to dismiss for failure to state a claim, "[courts] construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). "A plaintiff . . . must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Id.* at 1083 (quotation marks and citations omitted). Although a complaint does not need detailed factual allegations, it must provide the grounds of the claimant's entitlement to relief, contain more than labels, conclusions, or formulaic recitations of the elements of a cause of action, and allege enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Legal conclusions can provide a complaint's framework, but unless well-pleaded factual allegations move the claims from conceivable to plausible, they are insufficient to state a claim. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–51 (2009) "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.*

1.  ***Breach of Fiduciary Duty***

To state a cause of action for breach of fiduciary duty, a plaintiff must allege: "(1) a fiduciary duty on the part of the defendant and (2) a breach of that duty that (3) proximately caused (4) an injury." *Visvardis v. Ferleger*, 873 N.E.2d 436, 442 (Ill. App. Ct. 2007) (citing *In re Estate of Lis*, 847 N.E.2d 879, 885 (Ill. 2006)). A fiduciary relationship exists between a client and his attorney, which obligates the attorney to act with fidelity, honesty, and good faith. *Pippen v. Pedersen and Houpt*, 986 N.E.2d 697, 704 (Ill. App. Ct. 2013).

The Plaintiff asserts that DLA Piper breached its fiduciary duty to Heartland in two ways: first, when it preferred the interests of another client, Wright Capital, over the interests of Heartland; and, second, when it put its own financial interests over the interests of Heartland. With respect to the first breach, the Plaintiff alleges that Heartland and Wright Capital had conflicting interests, yet DLA Piper represented both of the entities in transactions related to the sale and leaseback of Heartland's assets and the merger with Wright Capital. The Plaintiff alleges that DLA Piper chose the interests of Wright Capital above Heartland's interests in these transactions because Heartland received no benefit to offset the more than $7 million loss it incurred from the transactions. Instead, Wright Capital and the individual decision makers at Heartland personally benefitted from the transactions. According to the Plaintiff, DLA Piper did not protect the interests of Heartland when it provided legal services that were not in its interests and failed to advise Heartland to obtain independent legal or business advice.

DLA Piper argues that the Plaintiff's claim is not plausible because it is "entirely illogical that DLA Piper would assist in looting the assets of the very company to which its client [Wright Capital] had loaned money, and which its client would obtain through the merger."

(DLA Piper's Reply 2, ECF No. 32.) DLA Piper points to the factual allegations acknowledging Wright Capital's $2.5 million loan to the financial struggling Heartland at the very time that an agreement was reached for Wright Capital to purchase the equity interest in iHealthcare. In connection with the loan, the owners of Wright Capital were placed in control of Heartland. When Wright Capital was unable to raise the $25 million purchase price, a leverage buyout was pursued instead. Thus, DLA Piper argues, the merger and leveraged buyout were not separate and distinct from the loan. Rather, the loan was required to preserve Heartland's operations and was part of the overall strategy of Wright Capital to obtain the equity interests in iHealthcare. DLA Piper argues that because the loan benefitted Heartland, and because Wright Capital benefitted from the leaseback transaction, the Plaintiff's theory that the sole purpose of the transactions between Wright Capital and iHealthcare was for Heartland's insiders to loot the assets of Heartland is not plausible.

This restatement of the Plaintiff's claim is not entirely accurate. The Plaintiff's claim is simply that DLA Piper, when it represented both Wright Capital and Heartland, breached its fiduciary duty to Heartland because it provided legal services for transactions that provided Heartland with no benefit to offset the $7 million loss it incurred from the transactions. The Plaintiff's position is that the transactions benefitted both Wright Capital, by allowing it to fund a purchase it could not otherwise finance, and the favored insiders. Whether DLA Piper will be able to establish that the $2.5 million loan should be viewed as an offset is an issue that extends beyond a determination of whether the Plaintiff's claim that DLA Piper put the interests of others over the interests of Heartland is plausible.

The Plaintiff also alleges that DLA Piper breached its fiduciary duties to Heartland when

it "maneuvered to have Heartland pay it for work that the firm performed for other clients." (Fourth Am. Compl. ¶ 92.) "'Fiduciaries are not prohibited from having direct dealings with their beneficiaries, but such transactions are subject to special scrutiny by the courts, and the burden is on the fiduciary to show that the transaction was fair.'" *Janowiak v. Tiesi*, 932 N.E.2d 569, 580 (Ill. App. Ct. 2010) (quoting *Home Federal Savings & Loan Ass'n of Chi. v. Zarkin*, 432 N.E.2d 841, 848 (1982)). Here, DLA Piper did not have dealings with Heartland through the redemption agreement. Moreover, as DLA Piper argues, if Heartland was not obligated by the redemption agreement to pay DLA Piper's fees, then DLA Piper could not have placed its interests above those of Heartland's through execution of the agreement. The Plaintiff's claim, however, does not rely on such direct dealings, but on the overall structure and relationship of the entities, as now clarified in the Fourth Amended Complaint. The Plaintiff maintains that because it has alleged that Heartland and iHealthcare were managed as a single company with Heartland being the only operating company that could generate money to pay the fees, and because DLA Piper was aware of these facts when it entered the transaction, that DLA Piper also knew that Heartland would ultimately be paying the invoices for legal work performed for Wright Capital. The Fourth Amended Complaint also alleges that DLA Piper indeed received payment from Heartland. In light of these allegations, the Court finds that the Plaintiff has plausibly claimed that DLA Piper failed to engage in the fair dealing that is required of a fiduciary and, in fact, put its interests above those of Heartland.

2.  *Aiding and Abetting Breach of Fiduciary Duty*

The Plaintiff argues that the DLA Piper knowingly provided substantial assistance to

insiders who were breaching their fiduciary duties to Heartland by looting the hospital of valuable assets at a time when it was teetering on the edge of bankruptcy. A claim for aiding and abetting a breach of fiduciary duty is a theory for holding the person who aids and abets liable for the tort itself. *See In re Nanovation Techs. Inc.*, 364 B.R. 308, 345 (N.D. Ill. 2007) (citing *Heffman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006)). To state a claim for aiding and abetting, a party must show: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003). The Plaintiff's Fourth Amended Complaint sets forth factual allegations to plausibly suggest that the iHealthcare stockholders were looting Heartland of its assets during a time of financial turmoil, that DLA Piper was aware that the iHealthcare stockholders had conflicts of interest that prevented them from examining whether the Wright Capital merger and the leaseback transaction through which it was funded were in Heartland's interests, and that DLA Piper performed the legal services necessary to negotiate and document the transactions anyway. In so doing, the Plaintiff has presented "enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The Court asks "*could* these things have happened, not *did* they happen." *Id.* DLA Piper offers argument that it contends undermines the Plaintiff's claim, but "[f]or cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Id.* The Plaintiff's story is not implausible simply because DLA Piper was also advising Wright

Capital on a possible suit against iHealthcare insiders or because Wright Capital loaned money to Heartland and was acquiring interest in iHealthcare. The Defendant's objections stray too far into the merits of the Plaintiff's case, which is a matter for another day. The Defendant's remaining arguments would be relevant if the Plaintiff was still claiming that DLA Piper committed legal malpractice, but they are not applicable to the aiding and abetting claim.

The Plaintiff has crafted claims that are plausibly supported with specific allegations regarding the relationships and transactions between the various entities involved. That these claims may prove, after discovery, to be unsupportable does not warrant dismissal at this stage of the proceedings.

## CONCLUSION

For the reasons stated above, DLA Piper's Motion to Dismiss Counts V and VI of Fourth Amended Complaint [ECF No. 23] is DENIED.

SO ORDERED on July 9, 2014.

         s/ Theresa L. Springmann
         THERESA L. SPRINGMANN
         UNITED STATES DISTRICT COURT
         FORT WAYNE DIVISION